Gayen HANCOCK et al., Plaintiffs,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, INC., et al., Defendants.

No. CIV–10–822–W.

United States District Court, W.D. Oklahoma.

Aug. 11, 2011.

Jason E. Robinson, Lydia J. Barrett, Richard L. Denney, Denney & Barrett, Norman, OK, Larry E. Coben, Coben & Associates, Scottsdale, AZ, Leon R. Russell, Russell & Shiver, Dallas, TX, Marcus W. Viles, Sr., Mark C. Menser, Viles and Beckman, Myers, FL, Robert M.N. Palmer, Law Offices of Palmer Oliver P.C., Springfield, MO, for Plaintiffs.

Cindy D. Hanson, James H. Walker, John P. Jett, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, Curtis M. Long, Fellers Snider Blankenship Bailey & Tippens, Tulsa, OK, for Defendants.

## ORDER

LEE R. WEST, District Judge.

This matter comes before the Court on the Motion to Dismiss or Alternatively to Compel Arbitration and Dismiss or Transfer filed by defendant BellSouth Telecommunications, Inc. ("BellSouth"). Plaintiff James Bollinger has responded in opposition.[1] Based upon the record, including BellSouth's reply and Bollinger's sur-reply, the Court makes its determination.

In addition to the movant, Bollinger and his three co-plaintiffs, Gayen Hancock,

---

1. The claims of co-plaintiffs Gayen Hancock, Montez Mutzig and David Cross are ad- dressed in separate Orders issued this date.

David Cross and Montez Mutzig, have sued twelve (12) other entities: American Telephone and Telegraph Company, Inc.,[2] Pacific Bell Telephone Company, Illinois Bell Telephone Company, Indiana Bell Telephone Company, Inc., Michigan Bell Telephone Company, Nevada Bell Telephone Company, The Ohio Bell Telephone Company, Wisconsin Bell, Inc., The Southern New England Telephone Company, AT & T Southeast, Inc., Southwestern Bell Telephone Company, named in the style as Southwestern Bell Telephone Company, L.P., and AT & T Operations, Inc. ("AT & T Ops").[3]

The plaintiffs have sought to represent a nationwide class of consumers who purchased and/or subscribed to services designed, manufactured, marketed, advertised and sold by the various defendants under the brand name "U-verse." *See* Doc. 1 at 2, ¶ 1; *e.g., id.* at 5, ¶ 26. The plaintiffs have complained that U-verse service, which generally includes three bundled or packaged components—television ("TV"), voice over Internet protocol ("VOIP" or "Voice") and Internet, is "plagued by defects and deficiencies," *id.* at 2, ¶ 2, and although "hyped and over-promoted as a technological advance ... [has] fail[ed] of its essential purpose...." *Id.* ¶ 3.

The plaintiffs have asserted claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., as well as under state law for fraud, civil conspiracy, conversion, unjust enrichment, breach of the implied covenant of good faith and fair dealing and breach of contract, and they have sought monetary, equitable and declaratory relief.

Bollinger is a citizen and resident of the State of Florida. *E.g.,* Doc. 1 at 3, ¶ 11. He has alleged that he purchased, or subscribed to, U-verse in September 2009. *E.g., id.* at 11, ¶ 31.[4]

Because U-verse services are provided by the subsidiary operating company according to the residence of the consumer, Bollinger, whose service and billing address is in the State of Florida, purchased or subscribed to services provided by movant BellSouth, the regional operating company for Florida.[5] AT & T Ops "is the entity ultimately responsible for AT & T U-verse in the area[ ] provisioned by ... BellSouth...." Declaration of Jeff Weber (October 20, 2010) at 2, ¶ 5.

The three U-verse components are governed by terms of service. The two components, TV and VOIP, are governed by a single set of terms of service; "AT & T U-verse Voice and TV General Terms of Ser-

---

**2.** In the complaint, this defendant is identified as "American Telephone and Telegraph Company, Inc., formally known as AT & T, Inc." Doc. 1 at 4, ¶ 12. The defendants have contended that "[t]here is no entity named 'American Telephone and Telegraph Company, Inc.,'" Doc. 53 at 13 n. 7, and that the plaintiffs have arguably "intended to name 'AT & T Inc.,' the telecommunications holding company and parent of other AT & T entities." *Id.*

**3.** As a result of corporate reorganization, effective December 31, 2010, AT & T Services,

Inc., is the successor-in-interest to AT & T Operations, Inc., for purposes of this litigation. *See* Doc. 88.

**4.** *But see* Doc. 56–1 at 4, ¶ 4 ("Bollinger completed the on-line registration and activation process on July 20, 2009"); *e.g., id.* at 15–16.

**5.** *E.g.,* Declaration of Susan M. Groover (October 19, 2010) at 2, ¶ 4 (BellSouth is "regional operating company that provides services to customers in Florida"). *See* Doc. 69 at 7 ("Bollinger dealt with BellSouth").

vice" ("TV/Voice TOS"). Internet service is governed by separate terms of service: "AT & T High Speed Internet Terms of Service/att.net Terms of Use" ("Internet TOS").

In the instant motion, BellSouth not only has challenged this Court's exercise of personal jurisdiction over it, but also, in the alternative, has moved the Court to compel arbitration of Bollinger's Internet-related claims pursuant to an arbitration agreement between the parties. BellSouth has further moved the Court to dismiss Bollinger's TV/Voice-related claims [6] under Rule 12(b)(3), F.R.Civ.P., or, alternatively, to transfer such claims to the United States District Court for the Western District of Texas under title 28, section 1404(a) of the United States Code.

In connection with the latter arguments, BellSouth has contended that Bollinger,

the only plaintiff to whom it provided service, was required to, and did, accept the TV/Voice TOS, including its forum selection provision,[7] before the U-verse TV and/or VOIP services were installed at his residence. The TV/Voice TOS, which was in effect at the time Bollinger purchased, or subscribed to, U-verse services and on which BellSouth has relied, reads in pertinent part:

> These TOS and the relationship between you and AT & T will be governed by the laws of the State of Texas without regard to its conflict of law provisions,[8] and you and AT & T agree to submit to the personal and exclusive jurisdiction of the courts located within the county of Bexar County, Texas.[9]

Doc. 56–3 at 30, ¶ 19(c).

■ Although forum selection clauses, like the foregoing clause, "are prima facie

---

**6.** Although it appears that Bollinger did not subscribe to Voice services, *see* Doc. 1 at 11, ¶ 31, the Court has used the phrase "TV/Voice-related claims" in describing claims relating to TV service, Voice service or both.

**7.** Bollinger's assertion that "[t]he TOS appear to have inconsistent forum-selection terms," Doc. 69 at 22, fails to recognize that Internet service and TV/Voice service are governed by two different sets of terms of service,

**8.** In *Stewart Organization, Inc. v. Ricoh Corporation*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), the United States Supreme Court held that "federal law, specifically 28 U.S.C. § 1404(a), [on which BellSouth has relied in part,] governs the … Court's decision whether to give effect to the parties' forum selection clause and transfer this case.…" *Id.* at 32, 108 S.Ct. 2239 (footnote omitted). Although the Supreme Court did not address the effect of a choice-of-law provision, as in the instant forum selection clause, the United States Court of Appeals for the Tenth Circuit has held that "when the contract contains a choice-of-law clause, a court can effectuate the parties' agreement concern-

ing the forum only if it interprets the forum selection clause under the chosen law." *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 428 (10th Cir.2006).

Under Texas law, the chosen law, courts are required to look to federal law in interpreting forum selection clauses. *E.g., In re International Profit Associates, Inc.*, 274 S.W.3d 672, 677 (Tex., 2009), Thus, in accord with *Ricoh*, *Yavuz* and extant Texas case law, the Court has applied federal law in determining whether the instant forum selection clause should be enforced.

**9.** The instant forum selection clause, which provides for "exclusive jurisdiction [in] … the courts located within the county of Bexar County, Texas," Doc. 56–3 at 30, ¶ 19(c), does not specify whether suit must be brought in state or federal court. BellSouth has therefore moved alternatively for dismissal under Rule 12(b)(3), F.R.Civ.P. (should such language require suit be brought in state courts "located within" Bexar County), or for transfer under section 1404(a) (should such language authorize the lawsuit be transferred to the United States District Court for the Western District of Texas, San Antonio Division, which is "located within" Bexar County).

valid and should be enforced ...," *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the existence of such a clause neither imposes an absolute duty, nor endows an absolute right, to litigate the dispute in the named forum. Rather, a clause's applicability as well as its enforceability in a given case depends upon the clause's classification-mandatory or permissive, *e.g.*, *Excell, Inc. v. Sterling Boiler & Mechanical, Inc.*, 106 F.3d 318, 321 (10th Cir.1997), and upon its reasonableness. *E.g.*, *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1344 (10th Cir.1992) (clause enforced "unless shown to be unreasonable") (citations omitted).

■ " 'Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.' " *K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494, 498 (10th Cir. 2002) (quoting *Excell, Inc.*, 106 F.3d at 321). Permissive forum selection clauses, " '[i]n contrast, ... authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere.' " *Id.* (quoting *Excell, Inc.*, 106 F.3d at 321).

■ The Court finds that the forum selection clause set forth in the TV/Voice TOS in effect at the time Bollinger purchased, or subscribed to, U-verse services is mandatory. The first phrase of the clause, the choice of law provision, dictates that the TVA/Voice TOS and the relationship between the consumer and AT & T will be governed by Texas law. The second, and generally dispositive phrase, specifies that both the customer "and AT & T agree to submit to the personal and exclusive jurisdiction of the courts located within the county of Bexar County, Texas." Doc. 56–3 at 30, ¶ 19(c).

Such language is unambiguous, unequivocal and obligatory. *E.g.*, *Milk 'N' More*, 963 F.2d at 1345–46 (clause stating "Venue shall be proper ... in Johnson County, Kansas,' " deemed mandatory). Accordingly, venue in any forum other than a "court[ ] located within the county of Bexar County, Texas," is improper, *e.g.*, *K & V Scientific Co.*, 314 F.3d at 499 (circuits agree that where venue is specified with mandatory language, clause is enforced), unless Bollinger, as the party resisting enforcement of the clause, can demonstrate that its enforcement in this case would be "unfair or unreasonable." *Excell, Inc.*, 106 F.3d at 321 (citation omitted). *See The Bremen*, 407 U.S. at 10, 92 S.Ct. 1907 (forum selection clauses should be enforced unless shown by resisting party to be unreasonable).

■ In an attempt to do so, Bollinger has first argued that he cannot be bound by the terms of the forum selection clause because there is no "empirical and verifiable evidence that [he] ... ever accepted or agreed to the forum selection clause." Doc. 69 at 6; *e.g.*, Doc. 1 at 22, ¶ 77 (plaintiffs "never provided copy [of Terms of Service]").[10]

David Saigh is an area manager for network process and quality in the AT & T

---

**10.** Bollinger has argued in his response that he was solicited to purchase U-verse after a sales pitch during which he was "promised from the start that there is no contract." Doc. 69–8. The exhibits on which Bollinger has relied, Docs. 69–1, 69–2, 69–3, and 69–8, assuming such exhibits even apply to Bollinger since they reference other individuals and/or pre-date the installation of his U-verse services, only demonstrate that there was no contractual period or term. Bollinger has submitted no evidence that would tend to show that he himself believed that no contract existed because of any representation made during any sales pitch, or made in any adver-

Network Operations business unit of AT & T Ops, and he is charged with the development of the methods and procedures used by premises technicians in the installation of U-verse services. Saigh has stated

(1) that "[w]hen a customer places an order for U-verse, it is sent to the Global Craft Access System ('GCAS') where [p]remises [t]echnicians receive and review the order[,]" Declaration of David Saigh (October 19, 2010) at 3, ¶ 6 ("Saigh Declaration");

(2) that "[s]tandard installation practice requires the [p]remises [t]echnician to ... provide a Welcome Kit containing the printed TV/Voice TOS to the customer for the customer's review[,]" *id.* ¶ 7;

(3) that "[a]ccording to standard installation procedure, the [p]remises [t]echnician provides the customer with an opportunity to review the TV/Voice TOS before the installation of U-verse services and has the customer acknowledge and agree to the TV/Voice TOS on the technician's laptop with the GCAS web application[,]" *id.* ¶ 8; and

(4) that "[a]cceptance of the TV/Voice TOS is required before installation proceeds." *id.* ¶ 10.

Saigh has further stated that because customer acceptance of the TV/Voice TOS is required before installation of the TV and VOIP components, *e.g., id.* (if customer refuses to accept TV/ Voice TOS, technician cannot install U-verse services), Bol-

linger "would have necessarily agreed to the TV/Voice TOS...." *Id.* at 4, ¶ 13.

Bollinger has responded that because the premises technician performed the installation and because Saigh has admitted that "the customer acknowledge[s] and agree[s] to the TV/Voice TOS on the technician's laptop ...," Saigh Declaration at 3, ¶ 8, there is no evidence that he (Bollinger) accepted the TV/Voice TOS and/or the forum selection clause set forth therein. *See also* Doc. 1 at 22, ¶ 77 (plaintiffs "never provided copy [of Terms of Service]").

David C. Chicoine is a senior specialist network support in the business unit of AT & T Ops, and his job responsibilities include support of the GCAS used by premises technicians in connection with U-verse installation. Chicoine has stated

(1) that "[b]efore a [p]remises [t]echnician installs U-verse service in the customer's home, the Acceptance Form[, for use by customers such as Bollinger,] is displayed electronically on the GCAS web application for the customer to read[,]" Declaration of David C. Chicoine (October 19, 2010) [11] at 2, ¶ 4 ("Chicoine Declaration");

(2) that "[a]fter the customer has an opportunity to read the Acceptance Form,[12] the customer must accept the TV/Voice TOS by clicking on the 'I acknowledge' button displayed on the GCAS web application[,]" *id.* at 3, ¶ 5;

(3) that "[a]fter the customer indicates his acceptance of the TV/Voice TOS in this

---

tisement or on any order form or worksheet that he himself received.

**11.** The declaration submitted by Chicoine as well as the declaration submitted by Saigh is "based upon ... [the declarant's] personal knowledge, review of corporate and business records, and interviews with appropriately

knowledgeable persons." Chicoine Declaration at 2, ¶ 2; *e.g.*, Saigh Declaration at 2, ¶ 2.

**12.** The Acceptance Form cautions customers "[b]efore ... acknowledging," Doc. 58–1 at 12, to "read the applicable terms of service provided by ... [the] AT & T installation technician ...." *Id.*

manner,[13] the Acceptance Form is populated with the customer's name, order number, account number, and date of acceptance[,]" *id.* ¶ 7; and

(4) that "[t]he customer's Acceptance Form is then stored on a server and associated with the customer's account." *Id.* ¶ 8.

BellSouth has submitted the Acceptance Form for Terms of Service for Purchase and Use of AT & T U-verse Voice and/or AT & T U-verse TV that was generated when Bollinger purchased, and subscribed to, U-verse TV and has shown that the installation of the U-verse TV services was completed on July 20, 2009, *See* Doc. 58–1, Exhibit C. In response, Bollinger's counsel has concluded that "any 'clicking' or 'accepting' was done quickly by the installer without giving an explanation to ... [Bollinger] or an opportunity for ... [Bollinger] to read hundreds of pages of contracts 'on the installer's time.'" Doc. 69 at 9.

Bollinger, himself, however, has provided no evidence,[14] through affidavit or otherwise, that shows that he was not "provide[d] a Welcome Kit containing the printed TV/Voice TOS ... for [his] ... review," Saigh Declaration at 3, ¶ 7, that he was denied the "opportunity to review the TV/Voice TOS before the installation of [his] U-verse services," *id.* ¶ 8, or that the premises technician failed to advise him about the TV/Voice TOS before the technician "click[ed] ... the 'I acknowledge' button displayed on the GCAS web application." Chicoine Declaration at 3, ¶ 5. Indeed, Bollinger has only speculated about his lack of acceptance of, or agreement to, the TV/Voice TOS,[15] and he has produced no evidence that conflicts with BellSouth's version of the installation process.

In an attempt to circumvent the enforcement of the mandatory forum selection clause [16] in this case, Bollinger has argued that enforcement would be unfair since the TV/Voice TOS

> implicates every concept of fraud, deceit, unfairness, overreaching, [and denial of] access to justice cited as a basis for

---

**13.** The Acceptance Form reads in pertinent part that the customer acknowledges by his actions that the TV/Voice TOS "have been provided by ... [the] AT & T installation technician," *id.*, that he (the customer) "confirm[s] that the TOS constitute a valid and binding obligation," *id.*, and that he has "read, understand[s], and agree[s] to all applicable terms of service, including this Acceptance Form[and] the AT & T U–Verse voice [a]nd TV General Terms of Service" *Id.*

**14.** In considering a motion under Rule 12(b)(3), *supra*, the Court may consider matters *outside the pleadings, and any factual allegations in the complaint are taken as true but "only to the extent that such facts are uncontroverted by defendant's affidavit[s]." Pierce v. Shorty Small's of Branson, Inc.,* 137 F.3d 1190, 1192 (10th Cir.1998).

**15.** BellSouth has not disputed Bollinger's contention that the order forms and worksheets do not constitute the parties' contract.

*See* Doc. 69–2 at 1 ("This form is an order request not a contract"). These forms and worksheets constitute offers to purchase services and are "record[s] of services selected." *Id.* Because as BellSouth has argued, the purchase of services is subject to applicable "terms or conditions of AT & T," *id.*, that "AT & T Sales Agents are not ... authorized to vary...." *Id.*

**16.** In challenging the existence and formation of the contract containing the forum selection clause, Bollinger has argued that "[i]t is important to note that the defendants retain the unilateral right to rewrite and modify the Terms of Service on a moment's notice, and can make any modifications retroactive, even while litigation is pending." Doc. 69 at 28. Bollinger has not argued that BellSouth has changed the terms of the forum selection clause; rather, he has contended that its ability to unilaterally do so renders the clause illusory.

rejection by [the United States Supreme Court]. . . .

Doc. 69 at 27.

█ Case law establishes that "clickwrap" contracts [17] are enforceable under applicable state law and federal law, e.g., *Salco Distributors, LLC v. iCode, Inc.*, 2006 WL 449156 (M.D.Fla.2006), and "[t]he

> In this connection, the TV/Voice TOS advises the customer that the
> TOS may be updated or changed from time to time. You can review the most current version . . . at any time at: uverse.att.com. If AT & T makes a change to these TOS and that change has a material impact on the Services, you will be provided notice of that change. Your continued use of the Services following such notice constitutes your acceptance of those changes.

Doc. 56–3 at 22, ¶ 1. The TV/Voice TOS further provides that

> [u]nless otherwise specified in these TOS, notices to you may be made via email, regular mail, posting online at uverse.att.com, recorded announcement, bill message, bill insert, newspaper ad, postcard, letter, or call to your billed telephone number. . . . It is your responsibility to check for such notices.

*Id.* at 29, ¶ 15.

The TV/Voice TOS specifies that BellSouth must give notice of any change that would materially impact the parties' agreement. It advises each customer that the TOS is "a legal document that details [the customer's] . . . rights and obligations . . ., *id.* at 22, ¶ 1, that "[b]y enrolling in, activating, using, or paying for Services, [the customer] . . . agree[s] to the terms and conditions in these TOS," *id.*, and "[i]f [the customer] do[es] not agree to the . . . terms and conditions, [the customer should] not use the Services, and cancel the Services. . . ." *Id.* Because the TV/Voice TOS requires notice to the customer of any material changes and because the customer can cancel if he does not agree to the same, the Court finds under the circumstances of this case that the TV/Voice TOS, including its forum selection clause, is not illusory.

**17.** "A clickwrap contract refers to an agreement that requires a computer user to read

fact that a forum-selection clause is contained within a so-called 'clickwrap agreement,' where a user accepts a website's terms and conditions, does not in and of itself render the clause invalid." *Segal v. Amazon.com, Inc.*, 763 F.Supp.2d 1367, 1369 (S.D.Fla.2011).[18]

Furthermore, forum selection clauses do not contravene any federal or state public

> the agreement and click 'I accept' before proceeding to the next screen or obtaining additional information." *Salco Distributors, LLC v. iCode, Inc.*, 2006 WL 449156 *2 n. 5 (M.D.Fla.2006). "Essentially, under a clickwrap arrangement, potential [customers] . . . are presented with the proposed . . . terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 429 (2nd Cir.2004).

**18.** Bollinger has attempted to distinguish those cases on which BellSouth has relied by arguing inter alia that the premises technician, and not the customer, clicked the "I accept" button which was displayed on the technician's computer. Bollinger however has failed to present any evidence that conflicts with BellSouth's recitation of the standard installation process and in particular, that supports any contention that the premises technician failed to provide him with the opportunity to review the TV/Voice TOS before the installation of U-verse services or failed to have him acknowledge and agree to the TV/Voice TOS on the technician's laptop with the GCAS web application.

Bollinger has further relied upon the decision in *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir.2002), to demonstrate the invalidity of the forum selection clause. In *Specht*, however, the Internet customer, unlike Bollinger, was urged to click on a button to download free software, without being advised that by doing so, the customer agreed to the terms and conditions of a proposed contract that contained an arbitration clause. The Second Circuit concluded that the customers were not given sufficient or reasonably conspicuous notice of those terms and that the plaintiffs therefore could not have manifested their assent to such terms.

The Second Circuit, however, in addressing a second agreement, which was a "clickwrap

policy, and "a party resisting enforcement [of such a clause] carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances." *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 957 (10th Cir.1992) (citations omitted).

In this regard, Bollinger has contended that "[t]he Terms of Service are boilerplate, adhesion instruments," Doc. 1 at 22, ¶ 77, and that "[t]he fine print in the Terms of Service is unconscionable and grossly inadequate to protect ... [him since he] ... had no meaningful choice in determining the limitations ...." *Id.*

Neither these allegations in the complaint however nor counsel's conclusory statements in the response regarding overreaching[19] are sufficient at this stage in light of the showing made by BellSouth. Moreover, Bollinger has advanced no compelling reason why he would be seriously inconvenienced, because of financial limitations or other concerns, or why he would be deprived of his day in court if required to try his TV/Voice-related claims in a "court[ ] located within the county of Bexar County, Texas."[20]

The Court finds that the testimony of the various declarants and the exhibits establish the existence of a mandatory forum selection clause, and that in the absence of any showing by Bollinger, by affidavit or otherwise, that enforcement of this clause would be unfair or unreasonable, BellSouth is entitled to dismissal of Bollinger's TV/Voice-related claims against it.

BellSouth has also challenged Bollinger's Internet-related claims and has argued that the Court should dismiss these claims because Bollinger is compelled to arbitrate them pursuant to the terms of a mandatory arbitration clause[21] that is enforceable under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., as well as applicable state law.

Section 2 of the FAA, which has been described by the United States Supreme

---

agreement," found that the customers when proceeding to initiate the installation of a program, "were automatically shown a scrollable text of that program's license agreement and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they had accepted the license terms." *Id.* at 21–22. If the customer "attempted to install [the program] without clicking 'Yes,' the installation would be aborted." *Id.*

19. The United States Supreme Court in *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), explained in connection with a resisting party's allegations of fraud that a "forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." *Id.* at 519 n. 14, 94 S.Ct. 2449. There has been no showing in this case that the forum selection clause itself was obtained by fraud or coercion.

20. *E.g., The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 18, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (incumbent on party seeking to escape application of forum selection clause to show that trial in contractual forum "will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court").

21. The defendants had requested that the issue of arbitration be deferred until the United States Supreme Court ruled in *AT & T Mobility LLC v. Concepcion*, No. 09–893. *See* Doc. 52 at 2. The United States Supreme Court had now ruled, *AT & T Mobility LLC v. Concepcion*, —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), and the Court finds the issues ripe for resolution.

Court as "the 'primary substantive provision of the Act,'" *AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)), and "as reflecting both a 'liberal federal policy favoring arbitration,'" *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927, and the 'fundamental principle that arbitration is a matter of contract,'" 131 S.Ct. at 1745 (quoting *Rent–A–Center, West, Inc. v. Jackson,* —— U.S. ——, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010)), provides in relevant part that

> [a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract [or] transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

Sections 3 and 4 of the Act "establish[ ] [the] procedures by which federal courts implement [section] 2's substantive rule." *Rent–A–Center,* 130 S.Ct. at 2776. Under section 3,

> [i]f any suit ... be brought in any of the courts of the United States upon an issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the

issue involved in such suit ... is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....

9 U.S.C. § 3.[22] Section 4 further provides that

> [a] party aggrieved by the alleged failure ... or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction ... in any civil action ... of the subject matter of a suit arising out of the controversy between the parties,[23] for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.... Where such an issue is raised, the party alleged to be in default may ... on or before the return day of the notice of application, demand a jury of such issue, and upon such demand the court shall make an order referring the issue ... to a jury in the manner provided by the Federal Rules of Civil Procedure....

---

**22.** BellSouth has not sought a stay of this matter under 9 U.S.C. § 3.

**23.** There is no dispute that the Court has subject matter jurisdiction over this lawsuit under title 28, section 1331 of the United States Code.

*Id.* § 4.[24]

Before "the [C]ourt shall make an order directing the parties to proceed to arbitration," *id.*, as requested by BellSouth, the Court must first find that a written agreement to arbitrate exists between Bollinger and BellSouth,[25] and that Bollinger "is [therefore] bound by a contractual duty to arbitrate...." *ARW Exploration Corporation v. Aguirre*, 45 F.3d 1455, 1460 (10th Cir.1995).[26]

Michael Frias is employed by AT & T Ops as a senior product manager, and his

---

**24.** "While the Tenth Circuit has not addressed precisely the standard of review a court is to apply in deciding a motion to compel arbitration, the Tenth Circuit has intimated that a summary-judgment-like standard applies when the 'making' of an arbitration agreement is at issue." *Brennan v. Global Safety Labs, Inc.*, 2008 WL 2234830 *5 (N.D.Okla. 2008) (citing *Hardin v. First Cash Financial Services, Inc.*, 465 F.3d 470, 474–75 (10th Cir.2006) (finding existence of genuine issue of material fact regarding "making" of arbitration agreement warrants denial of motion to compel arbitration)) (other citation omitted); *e.g., Aliron International, Inc. v. Cherokee Nation Industries, Inc.*, 531 F.3d 863 (D.C.Cir.2008) (district court properly examined motion to compel arbitration under summary judgment standard). *Cf. Conrad v. Phone Directories Co.*, 585 F.3d 1376 (10th Cir.2009) (motion to compel arbitration is expressly not motion made under Rule 12, F.R.Civ.P.).

Thus, the moving party is required to present evidence sufficient to demonstrate an arbitration agreement. Once that showing has been made, the party opposing arbitration must demonstrate a genuine issue of material fact as to the making of the arbitration agreement. *E.g., Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir.1997) (when parties dispute making agreement to arbitrate, jury trial on existence of agreement is warranted unless there are no genuine issues of material fact regarding parties' agreement). *See Gibson v. Wal–Mart Stores, Inc.*, 181 F.3d 1163 (10th Cir.1999) (reviewing district court's decision to grant motion to compel arbitration under summary judgment standard where parties agreed that the standard applied).

Bollinger made his demand for a jury on June 13, 2011. *See* Doc. 101. However, a party resisting arbitration is not entitled to a jury trial merely because he has demanded one.

BellSouth has presented evidence sufficient to demonstrate the existence of an arbitration agreement. Accordingly, Bollinger must raise a genuine issue as to the making of the agreement, using evidence that is comparable to that evidence identified in Rule 56, F.R.Civ. P., such as affidavits. Bollinger, however, has presented no evidence in support of his arguments and thus, he has failed to raise a genuine issue of material fact with regard to the existence of an arbitration agreement in the Internet TOS, warranting a trial by jury.

**25.** Bollinger has conceded that Florida law tracks the Federal Arbitration Act, 9 U.S.C. § 1 et seq., *see* Doc. 71 at 7, and its requirement that a valid written agreement to arbitrate must exist before a party may be compelled to arbitrate. *E.g., Seifert v. U.S. Home Corporation*, 750 So.2d 633 (Fla.1999). Moreover, "Florida courts must enforce arbitration agreements that are valid and enforceable under the Federal Arbitration Act, even where ... the arbitration agreement would not be enforceable under Florida law." *Jensen v. Rice*, 809 So.2d 895, 899 (Fla.App. 2002) (citations omitted).

**26.** Bollinger has argued strenuously that "[n]o arbitration contract ever existed." Doc. 71 at 7. Even assuming that Doc. 71–1 applies to Bollinger, *but see* Doc. 71–1 at 1 ("Dear Brent Palmer"), the document advises only that "no contract term [is] required on most bundles." *id.* Likewise, assuming Docs. 71–2 and 71–3 apply to Bollinger, *but see* Doc. 71–2 at 1 ("Decision Maker Name: ... Montez ... Mutzig"); Doc. 71–3 at 1 ("Billing Name: ... Gayen ... Hancock"), neither document negates the existence of a contract between the customer and the regional operating company in the absence of any evidence presented by Bollinger that he himself was advised that no contract existed and that he relied upon a document presented to him and had no intention of entering into a contract. *See* nn. 10, 15 *supra.*

duties include serving as product manager for U-verse High Speed Internet customer registration and activation. According to Frias, new customers who subscribe to Internet U-verse service do so by "complet[ing] an online registration process," Declaration of Michael Frias (October 19, 2010) at 2, ¶ 3 ("Frias Declaration"), and that

> [u]ntil this process is completed the new customer will automatically be directed to the U-verse registration page every time he ... attempts to connect to the Internet using a web browser over his ... U-verse High Speed Internet connection.

*Id.*

Frias has stated

(1) that "[d]uring the course of the registration process, the new customer is presented with a screen that displays the [then-current] Internet Terms of Service[,]" *id.;* and

(2) that "to proceed to the next step of the registration process, the customer must click a button labeled 'I Agree[.]'" *Id.*

The Internet TOS advises new customers, such as Bollinger to read the Internet TOS carefully, *see* Doc. 56–1 at 64, and it further advises that a customer's "registration, payment for or use of the Site and/or Service constitutes ... [his] agreement to be bound by the ... terms and conditions set forth in ... [the Internet TOS]." *Id.* The Internet TOS, which not only outlines Bollinger's "obligations," *id.,* but also "AT & T's obligations," *id.* further dictates the manner in which disputes regarding Internet service are to be resolved.

Paragraph 13 of the Internet TOS governing Bollinger's use of U-verse Internet service is entitled "Dispute Resolution with AT & T by Binding Arbitration," *id.* at 74 ¶ 13 (emphasis deleted), and it admonishes customers to "read ... carefully," *id.* (emphasis deleted), because their rights are "affect[ed]...." *Id.* (emphasis deleted). Paragraph 13 provides in pertinent part:

> Most customer concerns can be resolved quickly and to the customer's satisfaction by calling AT & T.... In the unlikely event that AT & T's business office is unable to resolve a complaint you may have to your satisfaction (or if AT & T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims courts instead of in courts of general jurisdiction.... Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted. ...

*Id.*

Paragraph 13 further outlines the arbitration agreement by providing:

> a. AT & T and you agree to arbitrate all disputes and claims between you and AT & T which are Arbitration Claims. "Arbitration Claims" as used in this Agreement means claims against AT & T based in whole or in part upon the Service(s).... This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to Arbitration Claims which[ ]
>
> • are based in contract, tort, statute, fraud, misrepresentation or any other legal theory; [and]
>
> • arose before this or any prior Agreement....

*Id.*

Paragraph 13 also cautions each new customer

that, by entering into this Agreement, [he] ... and AT & T ... each [agree to] waiv[e] the right to a trial by jury and to participate in a class action with respect to Arbitration Claims.

*Id.* at 74–75 (emphasis deleted).

The Court finds there can be no dispute in this case that the Internet TOS "evidences a transaction involving commerce," 9 U.S.C. § 2,[27] and clearly contains "[a] written provision ... to settle by arbitration a controversy ... arising out of such ... transaction." *Id.* Such provision shall be enforced against Bollinger unless he can successfully assert " 'generally applicable contract defenses,' " [28] *Rent–A–Center,* 130 S.Ct. at 2776, going to the formation of the agreement to arbitrate and/or establish under section 2 that the arbitration clause should "be invalidated [because of] ... fraud, duress, or unconscionability.' " *Id.*

■ State law principles of contract formation govern whether a valid arbitration agreement exists, and resolution of Bollinger's arguments [29] require examination of Florida law, which recognizes the essential elements of offer, acceptance and consideration. *E.g., Schoendorf v. Toyota of*

**27.** The phrase "involving commerce" is broadly construed, *e.g., Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 274, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *e.g.,* 9 U.S.C. § 1 ("commerce ... means commerce among the several States"), and has been deemed "the functional equivalent of 'affecting,' " 513 U.S. at 274, 115 S.Ct. 834, commerce, thereby "signal[ing] an intent to exercise Congress' commerce power to the full." *Id.* at 277, 115 S.Ct. 834. The United States Supreme Court has held "that the 'transaction' [must] in fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection," *id.* at 281, 115 S.Ct. 834, and "that the FAA's 'involving commerce' requirement 'reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce.' " *Comanche Indian Tribe of Oklahoma v. 49, L.L.C.,* 391 F.3d 1129, 1132 (10th Cir.2004) (quoting *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 401 n. 7, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (further quotation and other citation omitted)).

**28.** As case law teaches,
[t]here are two types of validity challenges under [section] 2: " 'One type challenges specifically the validity of the agreement to arbitrate,' " and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on a ground that the illegality of one of the contract's provisions renders the whole contract invalid."

*Rent–A–Center, West, Inc. v. Jackson,* —— U.S. ——, 130 S.Ct. 2772, 2778, 177 L.Ed.2d 403 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)). "Only the first type of challenge is relevant to ... [the] [C]ourt's determination whether the arbitration agreement at issue is enforceable." *Id.* (footnote and citations omitted). On the other hand, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent ... [the] [C]ourt from enforcing a specific agreement to arbitrate." *Id.*

Despite Bollinger's attempt to challenge the arbitration clause itself, *see, e.g.,* Doc. 71 at 15 ("Plaintiffs never told that the technician was actually a covert contract-agent, sent to hoodwink them into contracts and arbitration agreements that were previously undisclosed"), the Court finds there are no allegations in the complaint challenging the validity or enforceability of the arbitration clause itself on the grounds of fraud; thus, Bollinger's claims of fraud, *see* Doc. 1 at 18, should be considered by an arbitrator, and not the Court. *E.g., Buckeye Check Cashing,* 546 U.S. at 445–46, 126 S.Ct. 1204

**29.** The Court finds no merit under the circumstances of this case to Bollinger's argument that "a contract compelling arbitration outside Florida is unenforceable." Doc. 71 at 10. *See* Doc. 56–1 at 75, ¶ 13(c) ("Unless AT & T and you agree otherwise, any arbitration hearings will take place in the county ... of your billing address.").

*Orlando,* 2009 WL 1075991 *6 (M.D.Fla. 2009).

■ Mutual promises between two parties can create a contract, and the mutual promise to arbitrate and to relinquish the right to a trial by jury can constitute the necessary consideration to support an agreement to arbitrate, as in this case, where both BellSouth and Bollinger have "each agreed to resolve [their] ... disputes through binding arbitration," Doc. 56–1 at 74, ¶ 13, and have "each ... waiv[ed] the right to a trial by jury and to participate in a class action with respect to Arbitration Claims." *Id.* at 74–75, ¶ 13(a).

■ Bollinger has first argued that the agreement to arbitrate is illusory and therefore unenforceable because BellSouth has reserved the right to unilaterally modify and amend the Internet TOS and relieve itself of its promise to arbitrate. *E.g., Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1311 (11th Cir.1998) (an illusory promise does not constitute consideration for other promise and contract is unenforceable) (citations omitted); *e.g., Office Pavilion South Florida, Inc. v. ASAL Products, Inc.,* 849 So.2d 367, 370 (Fla.App.2003) (quoting *Restatement (Second) of Contracts* § 77 (promise is not consideration if by its terms the promisor reserves a choice or alternative performances)).

The Internet TOS in effect at the time Bollinger purchased, or subscribed to, Internet service provided

> From time to time, we may change this Agreement, the Site, or Service, including the rates and charges. We will provide you with thirty (30) days notice of material changes via either your Member Account e-mail address or U.S. mail. It is your responsibility to check your e-mail address for any such notices. Your continued subscription to the Service after receipt of such notice constitutes your acceptance of such changes.

Doc. 56–1 at 64, ¶ 1.

It further provides however that

> [n]otwithstanding any provision in this Agreement to the contrary, we agree that if AT & T makes any change to this arbitration provision (other than a change to the Notice Address) during the period of time that you are receiving Services, you may reject any such change by sending us written notice within 30 days of the change to the Arbitration Notice Address provided [in the Internet TOS].... By rejecting any such change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

*Id.* at 76, ¶ 13(g).

BellSouth's discretionary right to change the Internet TOS and in particular the arbitration clause is subject to two limitations. First, customers must be provided with advance notice of any material changes, and second, customers may reject any change proposed by BellSouth to the arbitration clause itself. In the absence of any argument advanced by Bollinger that specifically addresses these limitations on BellSouth's ability to amend the Internet TOS, the Court finds they are sufficient to prevent BellSouth's agreement to arbitrate from being rendered illusory.

■ Although Florida courts have recognized that "arbitration is a favored means of dispute resolution," *Miele v. Prudential–Bache Securities, Inc.,* 656 So.2d 470, 473 (Fla.1995) (citation omitted), and that Florida "[p]ublic policy ... favors ar-

bitration because it is efficient and avoids the time delay and expense associated with litigation," *Regency Group, Inc. v. McDaniels,* 647 So.2d 192, 193 (Fla.App.1994) (citation omitted),[30] Bollinger has contended that the "purported agreement is both substantively and procedurally unconscionable." Doc. 71 at 2, ¶ 3.

■ Under Florida law, Bollinger must establish that the agreement "is *both* procedurally and substantively unconscionable." *Gainesville Health Care Center, Inc. v. Weston,* 857 So.2d 278, 284 (Fla.App. 2003) (emphasis in original). And, because Bollinger has failed to show that the arbitration clause is substantively unconscionable, that is to say, that the terms of the parties' agreement are unreasonable or unfair, the Court has not considered Bollinger's procedural challenges.[31]

■ Florida law requires a showing that the arbitration clause is "so 'outrageously unfair' as to shock the judicial conscience," *Bland v. Health Care and Retirement Corporation of America,* 927 So.2d 252, 256 (Fla.App.2006) (quoting *Gainesville Health Care Center,* 857 So.2d at 285), before it may be deemed substantively unconscionable. As case law teaches, a substantively unconscionable contract is "one that 'no man in his senses and not under delusion would make on the one hand, and ... no honest and fair man would accept on the other.'" *Belcher v. Kier,* 558 So.2d 1039, 1044 (Fla.App.1990) (quoting *Hume v. United States,* 132 U.S. 406, 415, 10 S.Ct. 134, 33 L.Ed. 393 (1889)).

Florida courts have rejected arguments that arbitration clauses are substantively unconscionable because they require arbitration to be conducted on an individual basis as in this case. *E.g., Rivera v. AT & T Corp.,* 420 F.Supp.2d 1312, 1322 (S.D.Fla.2006). Under the instant Internet TOS, Bollinger may forego arbitration and instead pursue his Internet-related claims in small claims court. *See* Doc. 56–1 at 74, ¶ 13(a). The arbitration clause also contains incentives, such as cost-free arbitration,[32] and the customer's ability to recover as part of the arbitration process attorneys' fees, *e.g., id.* at 75–76, ¶ 13(d); *id.* at 76, ¶ 13(e), and expenses. *E.g., id.* at 76, ¶ 13(d).

The cases on which Bollinger has relied are distinguishable. In *Powertel, Inc. v. Bexley,* 743 So.2d 570 (Fla.App.1999), the Florida appellate court found the arbitration clause was substantively unconscionable because by limiting actual damages, it precluded the recovery of punitive damages regardless of how outrageous the defendant's conduct might be.

---

30. In the absence of any clear evidence of impropriety or even a prima showing of bias, the Court has disregarded Bollinger's claims that the American Arbitration Association ("AAA") is "AT & T's hired court," Doc. 71 at 18, and "that in return for repeat business the AAA renders favorable decisions to the AT & T cabal in an inordinately and statistically unreasonable high percentage of cases." *Id.* at 21.

31. "Procedural unconscionability relates to the manner in which a contract is made and involves consideration of issues such as the bargaining power of the parties and their ability to know and understand the disputed contract terms." *Bland v. Health Care and Retirement Corporation of America,* 927 So.2d 252, 256 (Fla.App.2006) (citation omitted). Bollinger's procedural challenges, as he has explained, are based upon "the process by which the ... arbitration clause was created and foisted on [him]...." Doc. 71 at 16.

32. *See* Doc. 56–1 at 74, ¶ 13 ("AT & T will pay all costs of arbitration, no matter who wins, so long as your claim is not frivolous.").

Bollinger has not cited to any precise language in the Internet TOS that restricts his recovery, and it appears that the Internet TOS places no limitations on the remedies available to Bollinger and in fact, advises customers that "[a]rbitrators can award the same damages and relief that a court can award." Doc. 56–1 at 74, ¶ 13.

In *Bellsouth Mobility LLC v. Christopher*, 819 So.2d 171 (Fla.App.2002), on which Bollinger has also relied, the state appellate court found the arbitration clause was substantively unconscionable because customers were "bound to arbitration," *id.* at 173, but BellSouth had "the option of pursuing court action in some instances. . . ." *Id.*

In this case, the Internet TOS not only outlines Bollinger's "obligations," Doc. 56–1 at 65, but also "AT & T's obligations," *id.*, and expressly provides that both Bell-South and Bollinger are obligated to arbitrate "all disputes and claims between [Bollinger] . . . and AT & T which are Arbitration Claims." *Id.* at 74, ¶ 13; *e.g.*, *id.* ("we each agree to resolve those disputes through binding arbitration"); *id.* ¶ 13(a) ("You and AT & T are each waiving the right to a trial by a jury and to participate in a class action with respect to arbitration claims") (emphasis deleted).

Finally, the Court finds in the absence of any evidence to the contrary,[33] there can be no dispute that Bollinger obligated himself, by his "registration, payment for or use of the Site and/or Service[,] . . . to be bound by the . . . terms and conditions set forth in . . . [the Internet TOS]." Doc. 56–1 at 64; *e.g.*, *Williams v. MetroPCS Wireless, Inc.*, 2010 WL 62605 *7 (S.D.Fla.2010) (acceptance of contract may be manifested by performance).

■■■ Having found that an agreement to arbitrate exists between Bollinger and BellSouth, the Court must next engage in " 'a three-part inquiry,' " *Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1261 (10th Cir.2005) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir.2001)), to determine whether Bollinger's dispute regarding his Internet service falls within the scope of the arbitration clause.[34] *E.g.*, *Granite Rock Co. v. International Brotherhood of Teamsters*, —— U.S. ——, 130 S.Ct. 2847, 2856, 177 L.Ed.2d 567 (2010) (court may order arbitration of particular dispute only where court is satisfied that "parties agreed to arbitrate that dispute") (emphasis deleted).

"First, recognizing there is some range in the breadth of arbitration clauses, . . . [the] [C]ourt should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the [C]ourt must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains an arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of

---

**33.** *E.g.*, *Williams v. MetroPCS Wireless, Inc.*, 2010 WL 62605 *8 (S.D.Fla.2010) (to create genuine issue entitled party seeking to avoid arbitration to a trial by jury on arbitrability question, unequivocal denial that agreement has been made is needed and some evidence should be introduced to substantiate denial); *e.g.*, *id.* (party does not place making of arbi-

tration agreement in issue simply by stating no agreement exists).

**34.** *But see* Doc. 56–1 at 75, ¶ 13(c) ("All issues, including the scope of this arbitration provision are for the arbitrator to decide").

arbitrability and arbitration of even a collateral matter will be ordered if the claims alleged implicates issues of contract construction or the parties' rights and obligations under it."

404 F.3d at 1261 (quoting *Louis Dreyfus Negoce*, 252 F.3d at 224) (emphasis deleted).

In accordance with extant case law, the Court finds the arbitration clause in this case is a "broad" clause,[35] *e.g.*, *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (construing clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof" as broad), as the parties so have agreed. *E.g.*, Doc. 56–2 at 74, ¶ 13(a) ("This agreement to arbitrate is intended to be broadly interpreted").

The Court therefore acknowledges the presumption of arbitrability that arises from such a finding, *e.g.*, *Cummings*, 404 F.3d at 1261, and holds that Bollinger should be compelled to arbitrate his Internet-related claims that " 'implicate[ ] ... the parties' rights and obligations under [the Internet TOS].' " *Id.* (quotation omitted).

The factual allegations advanced in the complaint in support of Bollinger's federal and state law causes of action touch on matters covered by the Internet TOS,[36]

and his entitlement to relief, if any, clearly relates to, and depends on, the terms of that document. Bollinger's claims therefore qualify as "Arbitration Claims" because they are claims "based in whole or in part upon the Service(s) ...," Doc. 56–1 at 74, ¶ 13(a), provided by BellSouth.

Accordingly, Bollinger's Internet-related claims, regardless of whether they sound in tort or in contract or are statutorily based[37] and regardless of whether they seek monetary or equitable relief, *e.g.*, *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1198 (10th Cir.2009) (to determine if claim is arbitrable under FAA, factual underpinning of complaint evaluated rather than labels attached to causes of action), fall within the scope of the arbitration clause and must be arbitrated.

Finally, the Court has considered Bollinger's argument that "cramming ... arbitration on a citizen in the absence of a proper contract is unconstitutional," Doc. 71 at 6, ¶ 3,[38] and his plea that

> it is time for the Courts to answer the one question that has been avoided since passage of the FAA: In a conflict between the Commerce Clause and the Bill of Rights which provision of the Constitution predominates?

*Id.* at 23.

The United States Supreme Court has declared that the FAA " 'is based upon and

---

**35.** *See* Doc. 56–1 at 74, ¶ 13(a) (" 'Arbitration Claims' as used in this Agreement means claims against AT & T based in whole or in part upon the Service[s]' ").

**36.** In the complaint, Bollinger has complained that "[h]e has experienced the following defects [in his Internet service]: (a) the internet access is slow, variable and disconnects him ... and (c) there is poor customer service and technical support." Doc. 1 at 11, ¶ 31.

**37.** *E.g.*, Doc. 56–1 at 74, ¶ 13(a) ("This agreement to arbitrate ... includes, but is not

limited to Arbitration Claims which[ ] ... are based in contract, tort, statute, fraud, misrepresentation or any other legal theory").

**38.** Bollinger has contended that " '[i]f the Court should find the existence of an arbitration agreement, and even 'if' the agreement is technically enforceable due to Defendant's authorized dirty tricks, then the statutory basis for authorizing dirty tricks is challenged as unconstitutional." Doc. 71 at 27.

confined to the incontestable federal foundations of "control over interstate commerce and over admiralty," ' " *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 271, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), and it has recognized that the FAA was "enacted ... to declare " 'a national policy favoring arbitration' of claims that parties contract to settle in that manner." " *Vaden v. Discover Bank,* 556 U.S. 49, 129 S.Ct. 1262, 1271, 173 L.Ed.2d 206 (2009) (quoting *Preston v. Ferrer,* 552 U.S. 346, 128 S.Ct. 978, 983, 169 L.Ed.2d 917 (2008) (quoting *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984))).

In light of the Supreme Court's pronouncements that the FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause," *Perry v. Thomas,* 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), and that the FAA's application is limited to only those " 'private agreements into which parties ha[ve] entered,' " *id.* (quotation omitted), whereby certain guaranteed rights, including the right to a trial by jury under the seventh amendment to the United States Constitution, may be waived, the Court finds that Bollinger has advanced no argument that compels this Court to find that the FAA is unconstitutional as applied to him or that an arbitral forum would be inadequate to protect those constitutional rights that he has not waived.

Accordingly, the Court [39]

(1) GRANTS BellSouth's Motion to Dismiss or Alternatively to Compel Arbitra-

tion [Doc. 51] filed on October 20, 2010, to the extent that the Court DISMISSES with prejudice Bollinger's Internet-related claims against BellSouth and COMPELS Bollinger to arbitrate his Internet-related claims "in the manner provided for in," 9 U.S.C. § 4, and pursuant to the arbitration clause set forth in the Internet TOS;

(2) GRANTS BellSouth's Motion to Dismiss or Transfer [Doc. 51] filed on October 20, 2010, to the extent that the Court hereby ENFORCES the mandatory forum selection clause in the TV/Voice TOS and in the exercise of its discretion, DISMISSES without prejudice under Rule 12(b)(3), *supra,* Bollinger's TV/Voice-related claims against BellSouth;

(3) because Bollinger's Internet-related claims against AT & T Ops derive from, and are closely intertwined with his contractual relationship with BellSouth, further FINDS that AT & T Ops may also enforce the Internet TOS, including its arbitration clause, and ORDERS that Bollinger's Internet-related claims against AT & T Ops should be and are hereby DISMISSED with prejudice; and

(4) because Bollinger's TV/Voice-related claims against AT & T Ops derive from his contractual relationship with BellSouth, further FINDS that AT & T Ops may also enforce the TV/Voice TOS and, in its discretion, DISMISSES without prejudice under Rule 12(b)(3), *supra,* Bollinger's TV/Voice-related claims against AT & T Ops.

---

39. Because the Court has found the issues of venue and arbitration dispositive of Bollinger's claims against BellSouth, the Court has not considered BellSouth's arguments regarding in personam jurisdiction. *E.g., Sinochem International Co. v. Malaysia International*  *Shipping Corp.,* 549 U.S. 422, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007); *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (no mandatory sequencing of nonmerits issues).